UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
THOMAS J. LIEVEN, Derivatively on Behalf   :   Civil Action No. 07-3849
of TRANSACTION SYSTEMS
ARCHITECTS, INC.,                          :
                                           :   VERIFIED SHAREHOLDER DERIVATIVE
                    Plaintiff,             :   COMPLAINT FOR VIOLATION OF THE
                                           :   FEDERAL SECURITIES LAWS AND
                                           :   STATE LAW CLAIMS FOR BREACH OF
        vs.                                :   FIDUCIARY DUTY, ABUSE OF
                                           :   CONTROL, CONSTRUCTIVE FRAUD,
HARLAN F. SEYMOUR, PHILIP G.               :   CORPORATE WASTE, UNJUST
HEASLEY, DAVID R. BANKHEAD,                :   ENRICHMENT, GROSS
DENNIS P. BYRNES, MARK R. VIPOND,          :   MISMANAGEMENT AND ACTION FOR
GREGORY D. DERKACHT, ANTHONY J.            :   ACCOUNTING
PARKINSON, JIM D. KEVER, ROGER K.          :
ALEXANDER, JOHN D. CURTIS, JOHN E.         :
STOKELY and JOHN M. SHAY, JR.,             :
                                           :
                    Defendants,            :
                                           :
        – and –                            :
                                           :
TRANSACTION SYSTEMS ARCHITECTS,            :
INC., a Delaware corporation,              :
                                           :
                    Nominal Defendant.     :
———————————————————— x   DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Transaction Systems Architects, Inc. ("Transaction Systems" or the "Company") on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior Transaction Systems insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to Transaction Systems insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to them since at least 1995.

2.      Between 1995 and 2006, Defendants also caused Transaction Systems to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by Transaction Systems carried with them an exercise price that was ***not less than*** the fair market value of Transaction Systems stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be ***backdated*** to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By October 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

4.      Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as New York and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused Transaction Systems to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior Transaction Systems executives; and (iii) subjected Transaction Systems to potential liability from regulators, including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed Transaction Systems and its senior executives to criminal and civil liability for issuing false and misleading financial statements. Specifically, Defendants caused or allowed Transaction Systems to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of Transaction Systems' earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on Transaction Systems. The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds. Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans. The Company has now been mentioned as one of several companies likely to have manipulated options. Meanwhile, certain of the Defendants, who received under-priced stock

options and/or knew material non-public information regarding Transaction Systems' internal control problems, abused their fiduciary relationship with the Company by selling over $19.1 million worth of their personally held shares at artificially inflated prices during the relevant period. This action seeks recovery for Transaction Systems against these faithless fiduciaries, as Transaction Systems' Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under New York and Delaware law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Transaction Systems is located in and conducts its business in this District and Defendants conduct business in this District.

## PARTIES

11.     Plaintiff Thomas J. Lieven is a shareholder of Transaction Systems, and holds and has continually held 365 shares of Transaction Systems stock since 1995.

12.     Nominal party Transaction Systems develops, markets, installs and supports a line of software products and services primarily focused on facilitating electronic payments.  In addition to its own products, Transaction Systems distributes, or acts as a sales agent for, software developed by third parties.  These products and services are used principally by financial institutions, retailers and e-payment processors, both in domestic and international markets.  The Company's headquarters are located at 120 Broadway, Suite 3350, New York, New York.

13.     Defendant Harlan F. Seymour ("Seymour") has been a director of Transaction Systems since May 2002 and Chairman of the Board of the Company since September 2002.  Because of Seymour's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Seymour participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

14.     Defendant Philip G. Heasley ("Heasley") has been a director, President and Chief Executive Officer ("CEO") of Transaction Systems since March 2005.  Because of Heasley's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other

- 4 -

information provided to him in connection therewith. During the relevant period, Heasley participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

15. Defendant David R. Bankhead ("Bankhead") was Senior Vice President, Controller and Chief Accounting Officer of Transaction Systems from September 2006 until May 2007. Previously, Bankhead served as Senior Vice President and CFO of Transaction Systems from July 2003 until he was appointed to his current positions in September 2006. Defendant Bankhead, by his specialized financial expertise, was in a unique position to understand the business of Transaction Systems, as well as its finances, markets and present and future business prospects. Because of Bankhead's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Bankhead participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

16. Defendant Dennis P. Byrnes ("Byrnes") has been Senior Vice President, General Counsel and Secretary of Transaction Systems since June 2003. Because of Byrnes' positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection

therewith. During the relevant period, Byrnes participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

17.    Defendant Mark R. Vipond ("Vipond") was appointed Chief Operating Officer, ACI Worldwide ("ACI"), an operating unit of Transaction Systems, in October 2006. Vipond joined ACI in 1985 and served in many executive positions until he was promoted to the positions of Executive Vice President of Transaction Systems and President of ACI in 1998. Vipond served in this capacity until his promotion to his current position in October 2006. Because of Vipond's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Vipond participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Based on his knowledge of material non-public information regarding the Company, defendant Vipond sold 141,800 shares of Transaction Systems stock for proceeds of $4.3 million during the relevant period.

18.    Defendant Gregory D. Derkacht ("Derkacht") has served as Executive Vice President of Transaction Systems since March 2005. Previously, Derkacht served as President and CEO of the Company from January 2002 to March 2005. Because of Derkacht's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to him in

connection therewith.  During the relevant period, Derkacht participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Derkacht sold 554,000 shares of Transaction Systems stock for proceeds of $12.7 million during the relevant period.

19.    Defendant Anthony J. Parkinson ("Parkinson") has been President ACI – America since October 2005.  Parkinson joined the Company in 1984 and served in various capacities until his promotion to his current position in 2005.  Because of Parkinson's positions, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the relevant period, Parkinson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Based on his knowledge of material non-public information regarding the Company, defendant Parkinson sold 60,389 shares of Transaction Systems stock for proceeds of $2 million during the relevant period.

20.    Defendant Roger K. Alexander ("Alexander") has been a director of Transaction Systems since February 2000.  Because of Alexander's position, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Audit Committee, defendant Alexander caused or allowed the dissemination of

the improper public statements described herein.  As a member (Chair) of the Compensation Committee, defendant Alexander controlled the other Defendants' stock option awards.  During the relevant period, Alexander participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

21.    Defendant John D. Curtis ("Curtis") has been a director of Transaction Systems since March 2003.  Because of Curtis's position, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member (Chair) of the Nominating and Corporate Governance Committee and member of the Audit Committee, defendant Curtis caused or allowed the dissemination of the improper public statements described herein.  During the relevant period, Curtis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

22.    Defendant Jim D. Kever ("Kever") has been a director of Transaction Systems since 1996.  Because of Kever's position, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  As a member of the Compensation Committee, defendant Kever controlled the other Defendants' stock option awards.  During the relevant period, Kever participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

23. Defendant John E. Stokely ("Stokely") has been a director of Transaction Systems since March 2003. Because of Stokely's position, he knew the adverse non-public information about the business of Transaction Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. As a member (Chair) of the Audit Committee and member of the Nominating and Corporate Governance Committee, defendant Stokely caused or allowed the dissemination of the improper public statements described herein. During the relevant period, Stokely participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

24. Defendant John M. Shay ("Shay") has been a director of Transaction Systems since May 2006.

25. The defendants identified in ¶¶13-14 and 20-24 are referred to herein as the "Director Defendants." The defendants identified in ¶¶14-19 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17-19 are referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

26. Each officer and director of Transaction Systems named herein owed the Company and Transaction Systems shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Transaction Systems' directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of Transaction Systems. Further, the misconduct of Transaction

Systems' officers has been ratified by Transaction Systems' Board, which has failed to take any legal action on behalf of the Company against them.

27.     By reason of their positions as officers, directors and fiduciaries of Transaction Systems and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Transaction Systems and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage Transaction Systems in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of Transaction Systems and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over Transaction Systems to divert assets to themselves via improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

28.     Because of their positions of control and authority as directors or officers of Transaction Systems, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; and (ii) willingness to cause Transaction Systems to disseminate false Proxy Statements for 1996-2006, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received.  Because of their positions with Transaction Systems, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to

disclose these facts promptly and accurately to Transaction Systems shareholders and the financial markets but failed to do so.

29.     Between 1996 and 2006, Defendants repeated in each Proxy Statement that the stock option grants made during that period carried an exercise price that was not less than the fair market value of Transaction Systems stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.  However, Defendants concealed until October 2006 that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, plaintiff seeks to have all of the unexercised options granted to Defendants between at least 1995 and 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

30.     To discharge their duties, the directors of Transaction Systems were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of Transaction Systems.  By virtue of such duties, the officers and directors of Transaction Systems were required, among other things, to:

(a)     manage, conduct, supervise and direct the business affairs of Transaction Systems in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of Transaction Systems);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of Transaction Systems to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of Transaction Systems to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of Transaction Systems' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of Transaction Systems and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that Transaction Systems' financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in Transaction Systems stock by the officers and employees of Transaction Systems; and

(i)    supervise the preparation and filing of any financial reports or other information required by law from Transaction Systems and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Transaction Systems and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

31.    Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Transaction Systems, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised Transaction Systems' entire Board during the relevant period.

32.    Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Defendants from taking such illegal actions.  In addition, as a result of Defendants' illegal actions and course of conduct during the relevant period, the Company is now under scrutiny.  As a result, Transaction Systems has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    improvidently paid executive compensation;

(b)    increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

(c)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)    incurring possible IRS penalties for improperly reporting compensation.

33.    These actions have irreparably damaged Transaction Systems' corporate image and goodwill.  For at least the foreseeable future, Transaction Systems will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Transaction Systems' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

34.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

35.    During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to Transaction Systems insiders and directors and causing Transaction Systems to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at Transaction Systems and the profits, power and prestige which Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Transaction Systems, regarding Defendants' compensation practices and Transaction Systems' financial performance.

36.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross

- 14 -

mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of Transaction Systems common stock so they could dispose of millions of dollars of their own Transaction Systems stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

37.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent Transaction Systems' financial results. Each of the Defendants was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

38.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

39.    Transaction Systems develops, markets, installs and supports a line of software products and services primarily focused on facilitating electronic payments. In addition to its own products, the Company distributes, or acts as a sales agent for, software developed by third parties. These products and services are used principally by financial institutions, retailers and e-payment processors, both in domestic and international markets. Most of its products are sold and supported through distribution networks covering three geographic regions: the Americas, Europe/Middle East/Africa and Asia/Pacific. The Company has three operating segments: ACI business unit, Insession Technologies business unit and IntraNet Worldwide business unit.

40.    Throughout the relevant period, Defendants caused Transaction Systems to grant them millions of stock options permitting them to buy Transaction Systems stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price the night before or by computing an average of the high and low prices on the day of the vote.

41.    However, many of the hundreds of thousands of options granted to Transaction Systems' executives had a hidden, valuable component:  they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.*, a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.*, a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.*, where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

## STOCK OPTION GRANTS

42.    Certain of Transaction Systems' manipulative stock option grants are described below:

**1999 Option Grants**

43.    Defendants dated many of Transaction Systems' 1999 option grants as of April 23, 1999 at $30.88 per share – below the closing price low for the month.  Transaction Systems' stock closed between $31.00 and $39.75 per share in April 1999.  This stock grant came after a large and dramatic drop in the Company's stock on extremely high volume.  Transaction Systems' stock declined $6 on April 23, 1999 to close at $31.00 – a one day decline of nearly 20%.  Defendant Vipond received 9,000 options at this price.  Additionally former Chairman of the Board, William Fisher ("Fisher"), former CEO David Russell ("Russell") and former CFO Gregory Duman ("Duman") each received 18,000 options at this price.  Former vice presidents Edward Mangold ("Mangold"), Jon Parr ("Parr") and Dwight Hanson ("Hanson") each received 9,000 options at this price.  Former General Counsel David Stokes ("Stokes") received 4,000 options at this price.

44.    Defendants further dated many of Transaction Systems' 1999 option grants as of October 19, 1999 at $25.06 per share – near the closing price low for the month.  Transaction Systems' stock closed between $25.00 and $30.75 per share in October 1999.  This stock grant occurred immediately before a large increase in the Company's stock price.  By November 3, 1999, Transaction Systems' stock closed at $36.00 per share – an increase of 44% in 11 trading days.  Defendants Parkinson and Vipond each received 2,000 options at this price.  Former executives Russell and Duman each received 5,000 options at this price and former executives Mangold, Hanson and Stokes each received 2,000 options at this price.  Former Vice President Jeffrey Hale ("Hale") received 20,000 options at this price.

**2000 Option Grants**

45.    Defendants dated many of Transaction Systems' 2000 option grants as of February 22, 2000 at $25.94 per share.  This stock grant also occurred immediately before a large increase in the Company's stock price.  By February 29, 2000, Transaction Systems' stock closed at $45.13 per

share – an increase of 74% in 5 days. Defendants Parkinson, Vipond and Alexander received 25,000, 25,000 and 20,000 options, respectively, at this price. Former executive Russell received 58,753 options at this price and former executives Mangold, Hanson, Hale and Stokes each received 25,000 options at this price. Former Vice President Dennis Jorgensen ("Jorgensen") received 10,000 options at this price.

## 2001 Option Grants

46.     Defendants dated many of Transaction Systems' 2001 option grants as of April 26, 2001 at $8.01 per share. This stock grant also occurred immediately before a large increase in the Company's stock price. By May 21, 2001, Transaction Systems' stock closed at $15.45 per share – an increase of 80% in 17 trading days. Former Interm CEO Larry G. Fendley received 100,000 options at this price.

47.     Defendants further dated many of Transaction Systems' 2001 option grants as of October 2, 2001 at $6.24 per share – below the closing price low for the month. Transaction Systems' stock closed between $6.25 and $10.93 per share in October 2001. This stock grant also occurred immediately before a large increase in the Company's stock price. By October 26, 2001, Transaction Systems' stock closed at $10.93 per share – an increase of 75% in 18 trading days. Former executive Fendley received 50,000 options at this price.

**2002 Option Grants**[1]

48.     Defendants dated many of Transaction Systems' 2002 option grants as of May 13, 2002 at $10.28 per share – near the low price of the month.  Transaction Systems' stock closed between $10.18 and $11.56 per share in May, 2002.  Defendants Parkinson and Vipond received 30,000 and 40,000 options, respectively at this price.  Former executives Hanson, Hale and Stokes each received 40,000 options at this price and former executive Jorgensen received 30,000 options at this price.

49.     Below are certain of Transaction Systems' stock option grants which occurred right before significant stock price increases:

---

[1]     As a result of a substantial decline in the fair market value of Transaction Systems's common stock in 2001, many of the previously granted backdated options held by Transaction Systems' officers, directors and employees had exercise prices substantially in excess of the fair market value of the Company's common stock at that time.  Accordingly in August 2001, Transaction Systems' board initiated a voluntary stock option replacement program.  Under this program, participants could voluntarily exchange their underwater options for new options with a lower grant price.  The replacement options were repriced on March 4, 2002 at $10.04 per share.  These options had exercises prices originally between $2.50 and $45.00 per share.  Any of the options that were repriced pursuant to this program that involved previously granted backdated options should be cancelled as they were originally granted as part of defendants' backdating scheme.













50.    Complicating matters and magnifying the harm to Transaction Systems, during the relevant period, Transaction Systems' internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

51.    Specifically, in many instances the reported dates Transaction Systems stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

52.    Through their fiduciary duties of care, good faith and loyalty, Defendants owed to Transaction Systems a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems Transaction Systems faced because of its deficient internal controls.  Furthermore, defendants who were members of the Audit Committee during the relevant period had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the

Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies. Defendants who were officers of Transaction Systems had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants who were directors of Transaction Systems had ample opportunity to discuss this material information with fellow directors at any of the scores of Board meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by Transaction Systems to the investing public and the Company's shareholders during the relevant period.

53.     Specifically, since at least 1995, Defendants have caused Transaction Systems to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| FISCAL YEAR[2] | REPORTED EARNINGS (Loss) (in millions) | REPORTED DILUTED EARNINGS-PER-SHARE FROM CONTINUING OPERATIONS |
|---|---|---|
| 1995 | $3.80 | $0.29 |
| 1996 | $15.04 | $0.50 |
| 1997 | $25.76 | $0.81 |
| 1998 | $32.26 | $1.08 |
| 1999 | $44.70 | $1.39 |
| 2000 | $2.11 | $0.34 |
| 2001 | $(80.06) | $(1.19) |
| 2002 | $15.27 | $0.44 |
| 2003 | $14.33 | $0.72 |
| 2004 | $46.69 | $0.95 |
| 2005 | $43.25 | $1.14 |

---

[2]     Transaction Systems' fiscal year ends September 30.

54.    Moreover, throughout the relevant period certain Defendants exercised many of these stock options contributing to their ability to sell over $19.1 million worth of Transaction Systems stock they obtained often by cashing in under-priced stock options:

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| VIPOND | 08/06/96–05/17/06 | 141,800 | $4,329,250 |
| DERKACHT | 11/10/03–02/23/06 | 554,000 | $12,785,820 |
| PARKINSON | 09/02/03–06/01/06 | 60,389 | $2,055,472 |
| | | | |
| TOTAL | | 756,189 | $19,170,542 |

55.    On October 27, 2006, Transaction Systems announced commencement of an internal review into the Company's past stock option granting practices.  The release stated in part:

Transaction Systems Architects, Inc. ("TSA" or the "Company") today announced that it is conducting a voluntary review of its historical stock option grants for all periods from 1995 through the present.  The Company's Audit Committee is overseeing this review, assisted by independent counsel.

The Audit Committee has not completed its review.  However, it appears that, in a number of instances during the 1995-2001 fiscal periods, measurement dates for accounting purposes differ from recorded dates, which under accounting principles in effect during this period would have required that non-cash charges be recorded to the extent that TSA's stock price on the measurement dates were higher than the prices on the recorded dates.  Accordingly, the Company will file a Form 8-K with the SEC stating that the financial statements and all earnings, press releases and similar communications issued by the Company relating to financial periods since fiscal year 1995 should not be relied upon.

Subject to completion of the Audit Committee's review, the Company currently expects to make accounting adjustments to stockholders' equity as reflected in its balance sheets for prior periods, including fiscal years 2002 through the first nine months of 2006, to reflect any required non-cash stock based compensation charges for fiscal years before 2002.  The effect of any such adjustments will be to increase paid-in capital and decrease retained earnings on all affected balance sheets.  As these are offsetting entries within stockholders' equity, the total amount of stockholders' equity for a particular period will not change.  Other effects on previous financial statements are possible.

The Company currently expects to complete its review prior to the filing of the Company's Annual Report on Form 10-K for fiscal year 2006, which is due to be filed on December 14, 2006.

- 25 -

56.    On March 16, 2007, the Company filed a Form 8-K with the SEC announcing

completion of it internal review of its historical stock option grant practices, stating in part:

> Transaction Systems Architects, Inc. announced the completion of its previously announced voluntary review of historical stock option granting practices. With the completion of its internal review, the Company has indicated that a number of measurement date errors occurred in fiscal years 1995 to 2002 that will require non-cash stock-based compensation-related adjustments to prior period financial statements. Management currently estimates that the non-cash adjustments will aggregate approximately $17 million, pretax, substantially all of which will be reflected in adjustments to the Company's financial statements for fiscal years 1995 to 2001.

> While the Company has completed its internal review, the Company's independent auditors have not concluded the audit of the Company's financial statements for the fiscal year ending September 30, 2006, including the impact of the above stock-based compensation adjustments. As such, the foregoing amount is subject to change as a result of the audit. The Company presently expects that audit to be concluded, and the Company's Annual Report on Form 10-K to be filed, on or about March 30, 2007.

> The review found that the Company's stock option granting practices prior to fiscal 2003 were subject to control weaknesses and other deficiencies. In a number of instances from 1995 through fiscal 2001, the Company's then CFO, not the Compensation Committee, selected grant dates for options awards, using hindsight in selecting grant dates. Management's consultations with Board members regarding option granting decisions during this period were not properly documented in all instances, and the record of Board action approving or ratifying option awards was, in a number of instances, inconsistent and incomplete. The review found no evidence of intentional misconduct.

> No member of current senior management was involved in the historical option granting practices.

> Under the accounting principles in effect during the periods prior to fiscal 2003, non-cash charges should have been recorded over the relevant option vesting periods to the extent that the prices of Company common stock on the actual measurement dates were higher than the prices on the previously recorded dates. Accordingly, the Company will restate its prior period financial statements to correct these errors in instances in which the NASDAQ closing market price on the revised measurement dates exceeded the closing market price on the original grant dates.

> The Company presently expects to restate all such prior period financial statements in its fiscal 2006 Form 10-K report as well as the key findings of the stock options review. As a result of these additional charges, the Company will also be restating its consolidated balance sheet as of September 30, 2005, and related

- 26 -

consolidated statements of operations, stockholders' equity and cash flows for each of the fiscal years ended September 30, 2005 and 2004 and each of the quarters in fiscal year 2005 in its 2006 Annual Report on Form 10-K. These additional charges do not affect previously reported revenue or cash provided by operating activities. These restated financials may include other adjustments unrelated to stock option matters. The aggregate amount of these adjustments is not expected to exceed $1 million dollars over the period 1995 through the present.

The review was conducted under the direction of the Audit Committee of the Company's Board of Directors by special independent counsel and forensic accountants, with assistance from the Company's current management and regular outside counsel. The Company estimates that the aggregate cost of conducting the review and management's analysis will be approximately $6 million, approximately $3 million of which was incurred in the Company's fiscal quarter ended December 31, 2006, and approximately $3 million of which is or will be incurred in the Company's fiscal quarter ended March 31, 2007.

57.     Then, on May 11, 2007, the Company filed its Form 10-K for the fiscal year ended

September 30, 2006, stating in part:

Based on the records and findings of our voluntary review of historical stock option granting practices, we determined that we should restate our prior period financial statements to correct the measurement date errors and to account for any compensation charges associated with revised measurement dates. We applied the accounting standards then in effect to determine, for every grant, the proper compensation expense. Accordingly, we are recording in this report additional non-cash compensation expense and related tax effects over the relevant option service periods consistent with then-controlling accounting principles during such periods to the extent that the prices of our common stock on the actual measurement dates were higher than the prices on the previously recorded dates. The non-cash compensation expense in aggregate was $18.8 million, pretax, substantially all of which is recorded and recognized from fiscal 1995 through fiscal 2001.

*          *          *

In light of the significant judgment used, alternate measurement date selections to those identified by us could have resulted in different stock compensation charges than those recorded in the restatement. Based on all available evidence and applying the lowest and highest trading prices of our common stock between alternative dates for the majority of applicable grants, the total cumulative pre-tax, non-cash, stock compensation charge that could alternatively have been recognized by us ranged from approximately $12 million to $27 million for the fiscal periods 1995 through 2005.

We utilized all available evidence from the review to determine the revised measurement dates noted above. This process required a significant amount of

judgment. In light of the significant judgment used, alternate approaches to those used by us could have resulted in different stock compensation charges than those recorded in the restatement.

We estimate that we will incur approximately $6 million to $7 million of expense, primarily professional fees, related to the historical stock option review and management analysis, substantially all of which was or will be expensed in the first ($3 million) and second ($3 million) quarters of fiscal 2007 and the remainder thereafter. In addition to the approximate $6 million to $7 million of expense incurred, we estimate that we will incur cash outlays of approximately $7 million for the settlement of vested options that optionees are or were unable to exercise due to the option review and which would otherwise expire. The actual amount incurred with respect to the settlement of options depends on the number of options that will expire prior to the Company becoming current on its quarterly financial statements as well as the stock price used to calculate any settlement amount. In most cases, these settlements reduced our additional paid-in capital balance and reduced our fully diluted outstanding shares.

58.    In effect, during the relevant period, the Defendants caused Transaction Systems' shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed Transaction Systems to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of Transaction Systems' earnings and restated earnings.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59.    Plaintiff brings this action derivatively in the right and for the benefit of Transaction Systems to redress injuries suffered and to be suffered by Transaction Systems as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the

aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

60.    Plaintiff will adequately and fairly represent the interests of Transaction Systems and its shareholders in enforcing and prosecuting its rights.

61.    Plaintiff is an owner of Transaction Systems stock and was an owner of Transaction Systems stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

62.    Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the Transaction Systems Board of Directors to institute this action against the officers and members of the Transaction Systems Board of Directors is excused as futile. A pre-filing demand would be a useless and futile act because:

(a)    The members of Transaction Systems' Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)    The Transaction Systems Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Transaction Systems' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not

disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting.  Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs.  Defendants breached the fiduciary duties that they owed to Transaction Systems and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting.  Certain directors are also dominated and controlled by other directors and cannot act independently of them.  Thus, the Transaction Systems Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by Transaction Systems' officers and directors and these acts are incapable of ratification.

(d)     The members of Transaction Systems' Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)     Any suit by the current directors of Transaction Systems to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)     Transaction Systems has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Transaction Systems any part of the damages Transaction Systems suffered and will suffer thereby.

(g)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)     Transaction Systems' current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Transaction Systems.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Transaction Systems against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Transaction Systems, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i)     In order to bring this action for breaching their fiduciary duties, the members of the Transaction Systems Board would have been required to sue themselves and/or their fellow

directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

63.    Plaintiff has not made any demand on shareholders of Transaction Systems to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Transaction Systems is a publicly traded company with approximately 37.2 million shares outstanding, and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON TRANSACTION SYSTEMS' FINANCIAL STATEMENTS

**The Fiscal 1995 Form 10-K**

64.    On or about December 28, 1995, the Company filed its fiscal 1995 Form 10-K with the SEC.  The fiscal 1995 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1995 Form 10-K included Transaction Systems' 1995 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 1996 Form 10-K**

65.    On or about December 24, 1996, the Company filed its fiscal 1996 Form 10-K with the SEC.  The fiscal 1996 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1996 Form 10-K included Transaction Systems' 1996 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting

for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 1997 Form 10-K**

66.    On or about December 23, 1997, the Company filed its fiscal 1997 Form 10-K with the SEC.  The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1997 Form 10-K included Transaction Systems' 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 1998 Form 10-K**

67.    On or about December 23, 1998, the Company filed its fiscal 1998 Form 10-K with the SEC.  The fiscal 1998 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1998 Form 10-K included Transaction Systems' 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 1999 Form 10-K**

68.    On or about December 29, 1999, the Company filed its fiscal 1999 Form 10-K with the SEC.  The fiscal 1999 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1999 Form 10-K included Transaction Systems' 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2000 Form 10-K**

69.    On or about December 29, 2000, the Company filed its fiscal 2000 Form 10-K with the SEC.  The fiscal 2000 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2000 Form 10-K included Transaction Systems' 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2001 Form 10-K**

70.    On or about December 27, 2001, the Company filed its fiscal 2001 Form 10-K with the SEC.  The fiscal 2001 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2001 Form 10-K included Transaction Systems' 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

71.    On or about January 13, 2003, the Company filed its fiscal 2002 Form 10-K with the SEC.  The fiscal 2002 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2002 Form 10-K included Transaction Systems' 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

72.    On or about December 23, 2003, the Company filed its fiscal 2003 Form 10-K with the SEC.  The fiscal 2003 Form 10-K was simultaneously distributed to shareholders and the public.

The fiscal 2003 Form 10-K included Transaction Systems' 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

73.    On or about December 14, 2004, the Company filed its fiscal 2004 Form 10-K with the SEC.  The fiscal 2004 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2004 Form 10-K included Transaction Systems' 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

74.    On or about December 14, 2005, the Company filed its fiscal 2005 Form 10-K with the SEC.  The fiscal 2005 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2005 Form 10-K included Transaction Systems' 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, Transaction Systems' compensation expense was understated and its net earnings were overstated.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

75.    The 1996-2006 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between 1996 and 2006.  In fact, it was not until the Company announced an internal review in October 2006, that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading.  Defendants have been unjustly enriched at the

expense of Transaction Systems, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

76.    On October 27, 2006, Transaction Systems announced commencement of an internal review into the Company's past stock option practices.

77.    Each dollar diverted to Defendants via the option backdating scheme has come at the expense of the Company.  For example, if defendant Vipond's 25,000 options granted in February 2000 had not been manipulated, but rather had a strike price of $45.13, instead of the $25.94 strike price, when Vipond exercised those options, the Company would receive $1.13 million instead of $648,500 – *a cost to the Company of $480,000 for this single instance of option backdating*.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

78.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions.  Given the many times Transaction Systems' grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

79.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of Transaction Systems, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

80.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring Transaction

Systems' public investors that Transaction Systems' option grants were being administered by a committee of independent directors and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

81.    Transaction Systems' public investors had no reason to know of the Defendants' breaches of their fiduciary duties until October 27, 2006, when the Company announced it had commenced a review into the Company's past stock option granting practices. The release stated in part:

> Transaction Systems Architects, Inc. ("TSA" or the "Company") today announced that it is conducting a voluntary review of its historical stock option grants for all periods from 1995 through the present. The Company's Audit Committee is overseeing this review, assisted by independent counsel.

> The Audit Committee has not completed its review. However, it appears that, in a number of instances during the 1995-2001 fiscal periods, measurement dates for accounting purposes differ from recorded dates, which under accounting principles in effect during this period would have required that non-cash charges be recorded to the extent that TSA's stock price on the measurement dates were higher than the prices on the recorded dates. Accordingly, the Company will file a Form 8-K with the SEC stating that the financial statements and all earnings, press releases and similar communications issued by the Company relating to financial periods since fiscal year 1995 should not be relied upon.

> Subject to completion of the Audit Committee's review, the Company currently expects to make accounting adjustments to stockholders' equity as reflected in its balance sheets for prior periods, including fiscal years 2002 through the first nine months of 2006, to reflect any required non-cash stock based compensation charges for fiscal years before 2002. The effect of any such adjustments will be to increase paid-in capital and decrease retained earnings on all affected balance sheets. As these are offsetting entries within stockholders' equity, the total amount of stockholders' equity for a particular period will not change. Other effects on previous financial statements are possible.

The Company currently expects to complete its review prior to the filing of the Company's Annual Report on Form 10-K for fiscal year 2006, which is due to be filed on December 14, 2006.

82.    On March 16, 2007, the Company filed a Form 8-K with the SEC announcing completion of it internal review of its historical stock option grant practices, stating in part:

> Transaction Systems Architects, Inc. announced the completion of its previously announced voluntary review of historical stock option granting practices. With the completion of its internal review, the Company has indicated that a number of measurement date errors occurred in fiscal years 1995 to 2002 that will require non-cash stock-based compensation-related adjustments to prior period financial statements. Management currently estimates that the non-cash adjustments will aggregate approximately $17 million, pretax, substantially all of which will be reflected in adjustments to the Company's financial statements for fiscal years 1995 to 2001.

> While the Company has completed its internal review, the Company's independent auditors have not concluded the audit of the Company's financial statements for the fiscal year ending September 30, 2006, including the impact of the above stock-based compensation adjustments. As such, the foregoing amount is subject to change as a result of the audit. The Company presently expects that audit to be concluded, and the Company's Annual Report on Form 10-K to be filed, on or about March 30, 2007.

> The review found that the Company's stock option granting practices prior to fiscal 2003 were subject to control weaknesses and other deficiencies. In a number of instances from 1995 through fiscal 2001, the Company's then CFO, not the Compensation Committee, selected grant dates for options awards, using hindsight in selecting grant dates. Management's consultations with Board members regarding option granting decisions during this period were not properly documented in all instances, and the record of Board action approving or ratifying option awards was, in a number of instances, inconsistent and incomplete. The review found no evidence of intentional misconduct.

> No member of current senior management was involved in the historical option granting practices.

> Under the accounting principles in effect during the periods prior to fiscal 2003, non-cash charges should have been recorded over the relevant option vesting periods to the extent that the prices of Company common stock on the actual measurement dates were higher than the prices on the previously recorded dates. Accordingly, the Company will restate its prior period financial statements to correct these errors in instances in which the NASDAQ closing market price on the revised measurement dates exceeded the closing market price on the original grant dates.

- 38 -

The Company presently expects to restate all such prior period financial statements in its fiscal 2006 Form 10-K report as well as the key findings of the stock options review. As a result of these additional charges, the Company will also be restating its consolidated balance sheet as of September 30, 2005, and related consolidated statements of operations, stockholders' equity and cash flows for each of the fiscal years ended September 30, 2005 and 2004 and each of the quarters in fiscal year 2005 in its 2006 Annual Report on Form 10-K. These additional charges do not affect previously reported revenue or cash provided by operating activities. These restated financials may include other adjustments unrelated to stock option matters. The aggregate amount of these adjustments is not expected to exceed $1 million dollars over the period 1995 through the present.

83.    Then, on May 11, 2007, the Company filed its Form 10-K for the fiscal year ended

September 30, 2006, stating in part:

Based on the records and findings of our voluntary review of historical stock option granting practices, we determined that we should restate our prior period financial statements to correct the measurement date errors and to account for any compensation charges associated with revised measurement dates. We applied the accounting standards then in effect to determine, for every grant, the proper compensation expense. Accordingly, we are recording in this report additional non-cash compensation expense and related tax effects over the relevant option service periods consistent with then-controlling accounting principles during such periods to the extent that the prices of our common stock on the actual measurement dates were higher than the prices on the previously recorded dates. The non-cash compensation expense in aggregate was $18.8 million, pretax, substantially all of which is recorded and recognized from fiscal 1995 through fiscal 2001.

*        *        *

In light of the significant judgment used, alternate measurement date selections to those identified by us could have resulted in different stock compensation charges than those recorded in the restatement. Based on all available evidence and applying the lowest and highest trading prices of our common stock between alternative dates for the majority of applicable grants, the total cumulative pre-tax, non-cash, stock compensation charge that could alternatively have been recognized by us ranged from approximately $12 million to $27 million for the fiscal periods 1995 through 2005.

We utilized all available evidence from the review to determine the revised measurement dates noted above. This process required a significant amount of judgment. In light of the significant judgment used, alternate approaches to those used by us could have resulted in different stock compensation charges than those recorded in the restatement.

- 39 -

We estimate that we will incur approximately $6 million to $7 million of expense, primarily professional fees, related to the historical stock option review and management analysis, substantially all of which was or will be expensed in the first ($3 million) and second ($3 million) quarters of fiscal 2007 and the remainder thereafter. In addition to the approximate $6 million to $7 million of expense incurred, we estimate that we will incur cash outlays of approximately $7 million for the settlement of vested options that optionees are or were unable to exercise due to the option review and which would otherwise expire. The actual amount incurred with respect to the settlement of options depends on the number of options that will expire prior to the Company becoming current on its quarterly financial statements as well as the stock price used to calculate any settlement amount. In most cases, these settlements reduced our additional paid-in capital balance and reduced our fully diluted outstanding shares.

84.    The review was conducted under the direction of the Audit Committee of the Company's Board of Directors by special independent counsel and forensic accountants, with assistance from the Company's current management and regular outside counsel. The Company estimates that the aggregate cost of conducting the review and management's analysis will be approximately $6 million, approximately $3 million of which was incurred in the Company's fiscal quarter ended December 31, 2006, and approximately $3 million of which is or will be incurred in the Company's fiscal quarter ended March 31, 2007.

85.    Finally, as fiduciaries of Transaction Systems and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from Transaction Systems' public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the Transaction Systems Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

88.     The 1996-2006 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Transaction Systems to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1995.

89.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

90.     The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

91.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     At all relevant times, Defendants, as directors and/or officers of Transaction Systems, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

94.     In breach of their fiduciary duties owed to Transaction Systems and its shareholders, the Defendants caused Transaction Systems, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Transaction Systems.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Transaction Systems and its shareholders.

95.     The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

96.     As a result of Defendants' misconduct, Transaction Systems has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

97.     Plaintiff demands an accounting be made of all stock option grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

## COUNT III

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.    Each of the Defendants agreed to and did participate with the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

100.    The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to Transaction Systems and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Transaction Systems and its shareholders.

101.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Transaction Systems and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

102.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Transaction Systems and its public shareholders.

103.    As a proximate result of each of the Defendant's conduct, in concert with the other Defendants, Transaction Systems has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Transaction Systems, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Transaction Systems.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding Transaction Systems.

106.    Defendants' conduct constituted an abuse of their ability to control and influence Transaction Systems.

107.    By reason of the foregoing, Transaction Systems has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    Defendants had a duty to Transaction Systems and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Transaction Systems.

110.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Transaction Systems in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care,

diligence and candor in the management and administration of Transaction Systems' affairs and in the use and preservation of Transaction Systems' assets.

111.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Transaction Systems to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Transaction Systems, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Transaction Systems.

112.    By reason of the foregoing, Transaction Systems has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

113.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

114.    As corporate fiduciaries, Defendants owed to Transaction Systems and its shareholders a duty of candor and full accurate disclosure regarding the true state of Transaction Systems' business and assets and their conduct with regard thereto.

115.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Transaction Systems' shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of Transaction Systems.  Thus they have committed constructive fraud and violated their duty of candor.

116.    By reason of the foregoing, Transaction Systems has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused Transaction Systems to waste valuable corporate assets.

119.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Transaction Systems, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

122.    All the payments and benefits provided to the Defendants were at the expense of Transaction Systems.  The Company received no benefit from these payments.  Transaction Systems was damaged by such payments.

123.    Certain of the Defendants sold Transaction Systems stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Transaction Systems.  A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for Rescission

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

125.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and Transaction Systems entered into during the relevant period were obtained through Defendants' fraud, deceit and abuse of control.  Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by Transaction Systems shareholders and filed with the SEC.

126.    All contracts which provide for stock option grants between the Officer Defendants and Transaction Systems and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT X

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Transaction Systems common stock on the basis of such information.

129.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset

- 47 -

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Transaction Systems common stock.

130.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Transaction Systems common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

131.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing Transaction Systems to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)     a proposal requiring that the office of CEO of Transaction Systems and Chairman of the Transaction Systems Board of Directors be permanently held by separate individuals and that the Chairman of the Transaction Systems Board meets rigorous "independent" standards;

(ii)     a proposal to strengthen the Transaction Systems Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)     appropriately test and then strengthen the internal audit and control function;

(iv)     rotate independent auditing firms every five years;

(v)     control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)     reform executive compensation.

D.     Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.     Awarding punitive damages;

F.     As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.     As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

- 49 -

H.    Awarding costs and disbursements of this action, including reasonable attorneys',

accountants' and experts' fees; and

I.    Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  May 16, 2007                    LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN (SR-7957)


                                        _____
                                                SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        WILLIAM S. LERACH
                                        DARREN J. ROBBINS
                                        TRAVIS E. DOWNS III
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        THE WEISER LAW FIRM, P.C.
                                        ROBERT B. WEISER
                                        121 N. Wayne Avenue, Suite 100
                                        Wayne, PA  19087
                                        Telephone:  610/225-2677
                                        610/225-2678 (fax)

                                        Attorneys for Plaintiff

I:\Transaction Systems\Pleadings\Cpt Transaction Systems Architects Derv.doc

## TRANSACTION SYSTEMS ARCHITECTS  INC. VERIFICATION

I,Thomas J. Lieven, hereby verify that I am familiar with the allegations in the

Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true

and correct to the best of my knowledge, information and belief.

DATE: _5/6/2007_     _____
                      SIGNATURE